GEORGE BURRY, APPELLEE, V. INTERSTATE TRANSIT LINES, APPELLANT.

287 N. W. 66

FILED JULY 18, 1939. No. 30520.

*Cleary, Suhr & Davis, Thomas F. Hamer* and *George C. Holdrege,* for appellant.

*B. J. Cunningham* and *W. P. Lauritsen, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

MESSMORE, J.

This is an appeal from a jury verdict rendered in the district court for Hall county, in favor of the plaintiff and against the defendant in the sum of $1,436.52, for injuries sustained by the plaintiff and damage to his truck as the result of the negligence of the driver of defendant's bus in maneuvering his bus to negotiate a turn on a detour road north from the Lincoln highway, running east and west near the westerly edge of the city limits of Cozad.

The plaintiff's petition sets forth several specific acts of negligence on the part of the driver of defendant's bus and evidentiary facts which will be covered in the opinion, and prays for damages. Defendant's answer is a general denial; in addition, alleges contributory negligence on the part of the plaintiff; by cross-petition alleges specific acts of negligence on the part of the plaintiff, and prays for damages to the bus and in the loss of its use. Plaintiff's reply is a general denial; and the answer to the cross-petition of defendant realleges negligence on the part of the driver of the defendant's bus. The substance of the pleadings of the respective parties referring to negligence will be more fully covered in the opinion as occasion requires.

Defendant, at the close of the plaintiff's evidence and at the close of all the evidence, moved for a directed verdict.

The court overruled the motions, and the ruling of the court in this respect is assigned as error; in addition, the defendant assigns as error that the verdict of the jury is clearly against the weight of the evidence. These two assignments will be considered together and require a review and an analysis of the evidence. The accident is admitted. The record discloses the following facts:

On the night of May 8, and the early morning of May 9, 1933, the plaintiff, one Charles Sherlock and a hitch-hiker, riding with them, were proceeding in an easterly direction en route to Grand Island with a load of live stock, in plaintiff's 1929 G.M.C. semi-trailer model truck. After they had passed about 12 miles beyond North Platte, Charles Sherlock took over the driving of the truck. The plaintiff was seated at his right and had dozed off to sleep. The hitch-hiker was sitting on the extreme right of the driver. At a distance of about a mile or two from the westerly edge of the city limits of Cozad, the defendant's bus passed the truck. The speed of the truck was approximately 30 miles an hour, and the speed of the bus was fixed at 55 miles an hour. Both the truck and the bus at the time were proceeding in an easterly direction. Upon arriving at the westerly edge of Cozad and crossing a small bridge, a graveled road just east of the bridge constituted a detour. This road runs to the north. The turn onto the north road was at a sharp or acute angle, a little narrower than a right angle, and, in order to negotiate the turn onto the north road, it was necessary for the bus driver, owing to the length and size of the bus, with a capacity of 33 passengers, A.C.S.,—at the time containing 31 passengers,—to maneuver the bus.

The driver's handling of the bus to negotiate the turn to the north, concisely stated, follows: The bus had reached the point in question about 3 a. m.; the driver pulled up into the intersection, and, not being able to make the turn, had to pull up a little farther, with the front wheels east of the intersection. There was a barrel just north of the black line and about 40 feet east of the east side of the bridge, and the front wheels of the bus were even with the barrel. The

rear end of the bus was in the intersection. The driver then cramped the wheel to the right again and "backed up so that the front wheels of the bus were about to drop off the pavement, and turning to the left again," he started up, hardly moving, as the bus was in low gear. The bus "had about reached the black line with the front wheels" at the time of the impact and was stopped. (The bus driver was evidently referring to the black line designating the center of the paved highway running east and west.) The front wheels of the bus occupied a position to the south of the black line on the pavement and to the east of what would be the black line on the road north and south. The front wheels of the bus were never off the pavement. The bus driver, in backing the bus, was busily engaged in handling the bus and did not look to the west. He was maneuvering the bus in the intersection for a period of two or three minutes. He should have looked to the west; he had just previously passed the truck a mile or two west. When he did look to the west the truck was a distance of from 25 to 75 feet west of the bus. The right front wheel of the truck struck the left front wheel of the bus at about the hub of the wheel. The front end of the bus slid around 6 to 10 feet to the east. The tire marks on the pavement caused by the sliding of the front wheel of the bus indicate the distance that the bus slid to the east, where it was standing at the point of impact. The left front wheel of the bus at the time of the impact was from 20 to 25 feet from the east line or edge of the bridge. The truck came to a stop after the impact in the ditch at the northeast corner of the intersection, about 45 feet distant from the front of the bus. The estimated length of the truck was 30 feet. The position of the bus after the impact, as testified to by other witnesses, follows:

John Dietz, a bus driver, westbound, having come over the north detour, stated that the truck was off the highway and the bus was partly on the pavement, headed north. There was room enough for him to get around or drive through between the point west of the black mark, caused

by the sliding of the front wheels of the bus, and the end of the road on the west, with two feet to spare. One Davis testified that he was present at the place where the accident occurred about 8 o'clock in the morning. He took several pictures of the intersection from different directions and at different angles, the pictures appearing in the record as exhibits and used quite extensively in the trial to indicate the location of the bus, by demonstrating the position of individuals appearing in the pictures as corresponding to the position of the bus, all of which had the effect of sustaining the bus driver's version of the accident. In some of the pictures were white streaks, indicating the lane of travel to the north road after crossing the bridge and turning off the pavement. One witness testified that from the point of the black streak where the tires on the front of the bus slid to the east, to the white streak, indicating the lane of travel to the north road, the distance was 15 feet; that is, 15 feet east of where the lane of travel to the north road turns off the highway. All of the evidence offered by defendant is an attempt to definitely fix the position of the bus in the intersection before and at the time of the impact; that is, far enough east of the east line of the bridge or where the detour road turns to the north and far enough removed from the turn on the north road and from the north side of the pavement running east and west; that is, the front wheels of the bus resting about on the black line of the pavement, marking the center thereof.

The version of the plaintiff and his witnesses of the accident may be briefly summarized as follows: The driver of plaintiff's truck testified that the bus had come off the side road south upon the paving running east and west. The front of the bus was headed north. The bus jerked and came to a stop and covered the full length of the pavement north and south, except about three feet from the north side thereof. The pavement was 20 feet wide. Witness could not see the headlights on the bus and they were not visible when the bus was crossways and until the bus had driven onto the highway. He could have seen the bus within the

range of vision of the lights of the truck at a distance of 300 feet if the bus at the time had been in the intersection. When the truck was about 50 to 55 feet from the bus he observed the bus. He had previously observed the "Slow" sign on the highway, and the sign with an arrow pointing to the north, indicating a detour road to the north. The truck was then traveling at a speed of about 20 miles an hour. He released his foot from the gas feed and placed his foot on the foot brake. When he saw the bus he yelled "Look out." The plaintiff, who had been sleeping, then awakened, and he saw the bus at a distance of 25 feet from the truck. He immediately braced his foot against the dash and applied the emergency brake assisting the driver of the truck to turn the steering wheel to the left, the driver having tried with all of his strength to turn to the left. The right front wheel of the truck struck the left front wheel of the bus at about the hub of the wheel. The position of the bus, east and west, was not fixed by either plaintiff or the driver of plaintiff's truck. The plaintiff testified that the bus was standing still at the time the truck struck it, and the lights on the interior of the bus were not burning. At the time of the impact the trailer pulled the fifth wheel loose from the truck and broke in the back of the cab, striking the plaintiff between the shoulders and against the small of his back, and striking the driver of the plaintiff's truck across the hip. The plaintiff testified he asked the bus driver why he came out on the pavement the way he did, being familiar with the road, and that the bus driver stated: "If he had looked both ways he wouldn't have drove on it," and that the bus driver later made a written statement to the same effect. The brakes on the bus seem to have jammed in such a manner that they would not release, requiring the rocking of the bus back and forth a few times to accomplish the release of the brakes. When this was done, the bus left under its own power.

The plaintiff prepared a sketch, showing the paved road east and west, the detour to the north, and the south road, the position of both the truck and the bus at the time of the

impact. The bus was located, on the sketch, near the center of the intersection of the road running north and south, with 12 or 13 feet of the bus on the south road, the bus facing north. The truck was located slightly into the intersection of the north and south road, the front of the truck facing northeast. An exhibit appears in the evidence prepared by the bus driver, containing a diagram of the roads in question, and the position of the bus and truck. The bus is shown in about the center of the intersection, running north and south, with about a third of the rear end of the bus extending onto the south road. The front part of the bus was headed north. The position of the truck was farther into the intersection than in the plaintiff's sketch, and not headed as far to the north, but more to the east. In this report the bus driver also stated: "The turn is to left off a bridge and is too short to make with the bus. Ran up ahead and backed into old highway off south side of pavement." Defendant contends further that the plaintiff did not intend to make the turn to the north, but intended to continue traveling east; that plaintiff had stated the road to the east was clear. The evidence is in conflict on this point. A further contention is made by defendant that plaintiff's driver failed to see or obey the road sign. We have previously related the testimony of plaintiff's driver in this respect. The evidence is in conflict as to the existence of a barrel at the place where the defendant's driver claimed it was located, and whether or not a barricade was up to the east of the location of the barrel. The barricade was apparently down, and this fact was discovered by the plaintiff and the defendant's bus driver. The torches at the road signs were not burning, and it is claimed by the defendant and reported by its driver that the driver of the truck did not notice the torches and kept traveling east. The "Road Closed" sign back of the paved road to the west was down, and the flares which were put out beside the "Road Closed" signs, and which were supposed to be on the pavement at the point of the detour, were not burning. The plaintiff, in addition, testified that the tracks of the bus extended back on the

south road 75 to 80 feet. There was also evidence that it had rained, and that the road signs were only partly visible. The brakes and the lights on the truck were in good repair. Plaintiff's driver was helped into the truck immediately after the accident, having sustained an injury.

We have detailed a greater portion of the evidence as to the accident and are convinced that in several instances there is a sharp conflict in the evidence, and especially so on the essential point submitted to the jury by the trial court in instruction No. 1, in referring to the negligence of the bus driver, if any, in the following manner: "That said bus was driven onto the highway from the south without stopping and without any signal or warning to the plaintiff of any intention to do so."

We conclude that the rule of law applicable to a case where the evidence is in conflict and controverted on many essential points is reflected by the following authorities:

"In actions to recover damages for personal injuries, issues of negligence and contributory negligence are questions for the jury, where the evidence is conflicting." *Frish v. Swift & Co.*, 97 Neb. 707, 151 N. W. 165.

"A verdict of a jury in a law action based upon conflicting evidence will not be disturbed on appeal unless clearly wrong." *Potach v. Hrauda*, 132 Neb. 288, 271 N. W. 795; *Schindler v. Mulhair*, 132 Neb. 809, 273 N. W. 217. See *Boehler v. Kraay*, 130 Neb. 233, 264 N. W. 745; *Wilfong v. Omaha & C. B. Street R. Co.*, 129 Neb. 600, 262 N. W. 537.

"Where the facts in evidence tend to show both negligence and contributory negligence, the duty to make the comparison required by the statute rests with the jury, unless the evidence as to negligence is legally insufficient, or contributory negligence is so clearly shown that it would be the duty of the trial court to set aside a verdict in favor of the plaintiff. Ordinarily, wherever there is room for difference of opinion upon these questions, they must be submitted to the jury." *Disher v. Chicago, R. I. & P. R. Co.*, 93 Neb. 224, 140 N. W. 135. See, also, *Haffke v. Missouri P. R. Corporation*, 110 Neb. 125, 193 N. W. 257.

We are also convinced that the facts in this case present a case where an instruction on comparative negligence is applicable and such instruction was given by the trial court; in fact, none of the instructions of the trial court are attacked. The plaintiff's petition presents a variance with the facts, in that the petition states that plaintiff was driving his truck at the time of the accident, when, in fact, the witness Sherlock was driving the truck. The variance exists, but the defendant was aware, within a reasonable length of time before the trial, of the fact that Sherlock was driving the truck, and was not taken by surprise.

In addition, the record presents a statement in writing by plaintiff's driver, Sherlock, apparently signed by him, and in his testimony he denies the signature. The defendant contends that testimony of this nature is unworthy of belief. The jury had the benefit of his testimony. They are the constitutional triers of fact and the sole judges of the credibility of the witnesses. "The credibility of witnesses and the weight to be given their testimony are questions for the jury." *Davis v. Bixby,* 132 Neb. 25, 270 N. W. 834.

Defendant complains that the damages are excessive. We have considered the damage to the truck, the testimony as to its value immediately before and immediately after the accident, and the fact that the plaintiff received $135 for the truck, which was sold for junk, and have reviewed the medical testimony offered by the plaintiff. The plaintiff was injured between his shoulder blades and across the small of his back and at the time of trial, nearly five years later, was complaining of a stabbing pain, stating that he at times would go two or three months with no trouble; that he was not able to do any heavy lifting or to sit in one position for long at a time without causing pain across his shoulders, and the small of his back, and that the only manner in which he was able to sleep was by lying on the flat of his back. He had paid about $325 for chiropractic treatments in Alliance and in Omaha since the accident. He apparently was not examined by a medical doctor or a surgeon until about the time of trial. The defendant's con-

tention is that the jury allowed $1,000 for the personal injuries sustained by the plaintiff, which was excessive, for the reason that the plaintiff was suffering, at the time of trial, with chronic infectious arthritis, resulting, probably, from infected teeth and tonsils, which was in no way connected with the accident. We are unable to say definitely the amount that was allowed by the jury for the injuries sustained by the plaintiff.

The medical testimony for the plaintiff discloses a slight lipping of the sixth cervical vertebra, suggestive of an old traumatic injury, such as a compression fracture of slight degree; that arthritis of the spine, which is a thickening of the cushioned tissues between the vertebræ, suffered by the plaintiff, was due to the injury he received in the automobile accident.

The physician testifying for the defendant found, by examination of the X-rays, no fracture and no evidence of misplacement, and attributed the condition of the plaintiff to systemic infection. This constitutes a direct conflict in the medical testimony, presenting a question for the jury as to the credibility of the witnesses testifying as to plaintiff's condition.

Doctor Byers, a chiropractor, who had attended the plaintiff for a period of three years and had given him 36 or 38 treatments, testified that he found "a taut muscular condition and a slight sublaxation between the spinal processes of the spine." "Sublaxation," as used by this doctor, means a nerve impingement. He had examined the plaintiff a week before trial and found him to be extremely lame in the lower spinal region. His condition at that time was about the same as when the doctor first saw him.

We conclude from an examination of the testimony that the damages are not excessive.

AFFIRMED.