Hedvig Edna Gutoski, Administratrix, appellant, v.
Mabel C. Herman, appellee.

25 N. W. 2d 902

Filed January 31, 1947. No. 32115.

*Wear, Boland & Nye,* for appellant.

*Brown, Crossman, West, Barton & Fitch* and *Gross & Welch,* for appellee.

Heard before Simmons, C. J., Carter, Messmore, Yeager, Chappell, and Wenke, JJ., and Wilson, District Judge.

Messmore, J.

This is a law action brought by the administratrix of the estate of Peter P. Gutoski to recover damages sustained by the deceased's widow and minor children as a result of an accident caused by a collision between a gasoline transport owned by the defendant and driven by one of her employees, and a Chevrolet automobile driven by Peter P. Gutoski who lost his life in the accident. At the close of all the evidence the defendant moved for a directed verdict. This motion was sustained by the trial court. Upon the overruling of the motion for new trial, plaintiff appealed.

For convenience, the appellant will hereinafter be referred to as the plaintiff, and the appellee as the defendant.

The plaintiff contends that the trial court erred in refusing to submit the case to the jury. This contention raises the question as to the sufficiency of the material, competent, and relevant evidence introduced by the litigants to determine whether the same makes a case to be submitted to a jury. We set forth in substance as much of the pleadings and the evidence disclosed by the record as we deem necessary to determine this appeal.

The plaintiff's petition alleged negligence on the part of defendant's driver, in substance as follows: That he operated the gasoline transport at a dangerous and excessive rate of speed in violation of the laws of Nebraska; in failing to have the transport under proper control while operating it in a westerly direction upon the wrong side of the highway; by suddenly turning the transport from the north side of the highway to the south side thereof directly into and against the automobile occupied by the deceased; and failing to seasonably apply the brakes thereof and bring it to a stop before colliding with the automobile occupied by the deceased.

The defendant's answer alleged that the driver of the transport drove west in the outside or north lane of the highway in a careful and prudent manner; that immediately prior to the collision Gutoski either backed or drove his car into the north lane of the highway directly in the path of the westbound transport, then started eastward in the north lane of the highway and collided with the transport; and that there were no lights on Gutoski's car.

The reply denied any acts of negligence on the part of Gutoski.

A brief description of the vicinity where the accident occurred shows Dodge Street west of Omaha is approximately 42 feet wide, paved in four lanes, the two outside lanes being concrete and the two center lanes brick. Starting at a

point and proceeding west from the west track of the Chicago and Northwestern Railway to a bridge over Pappio Creek is a distance of 330 feet. The bridge extends from this point west 100.8 feet, and on each side thereof are guardrails. The guardrail on the south side of the bridge extends east 42 feet. Two or three feet south of the edge of the pavement is the Miller mail box which is 243 feet distant from the west track of the railroad. The distance from this mail box to the east end of the south guardrail is 62 feet. From the west end of the bridge to the center line of a roadway which runs south off of Dodge Street is 256 feet. Off of this roadway is the Rose Lodge. In close proximity to this road is a brick paved road on the north side of Dodge Street, running in a northwesterly direction. On this road is located Mary's Clubhouse Inn. On the northeast corner of the intersection of this brick road is the Tourist Village filling station. Approximately 100 feet east of the bridge over Pappio Creek is located (Miller's) Wishbone Hut, which sets 47 feet back from the north edge of the Dodge Street pavement. In front of the Wishbone Hut is a graveled parking space.

The accident occurred on the Dodge Street road at a point approximately 200 feet west of the Chicago and Northwestern Railway tracks, in close proximity to the entrance of the Wishbone Hut. The surface of the highway is approximately level for a distance of a few hundred feet to the east and to the west of the point where the accident occurred.

During the evening of April 14, 1944, the emloyees of the organization where Mr. Gutoski was employed entertained members thereof who were about to enter the service of the armed forces of the United States. After leaving the entertainment early in the morning of April 15, 1944, Mr. Gutoski and a companion, also an employee of the organization, after visiting a place in east Omaha drove west on Dodge Street and apparently to the places designated as the Rose Lodge and Mary's Clubhouse Inn, for refresh-

ments. The places were about to close, so they were not served. After they left Mary's Clubhouse Inn they proceeded to Dodge Street. It is the defendant's contention that they proceeded to the Wishbone Hut, as heretofore described and located.

The gasoline transport consisted of a 1940 International tractor and Freuhauf trailer, and at the time was loaded with 4,450 gallons of gasoline. After loading the transport, the driver thereof traveled to the vicinity of Seventy-fifth and Dodge Streets and proceeded west on Dodge Street in the north lane of the highway, stopped at the railroad tracks, put the transport in fourth gear, and continued west at a speed of 25 miles per hour. The vehicle was lighted; and the weather was foggy and misty. The driver testified that it was not raining. After proceeding approximately 200 feet or more west from the railroad tracks and arriving in the vicinity of the Wishbone Hut, the accident occurred.

The driver of the transport described the accident as follows: "* * * all at once I saw a car about four feet from me, coming out * * * on the north side of the highway, and I knew it was going to hit me, and the first thing I thought, it would be in the back, and so I turned to the left as quick as I could to throw the trailer, and all at once there was a big crash on the right side of my truck and then I didn't know no more; something hit me and knocked me unconscious and the next thing I knew I was laying in the bottom of the creek * * *." He regained consciousness when someone took hold of his foot, and again became unconscious, and subsequently regained consciousness in the hospital. There were no lights on the car, they came on all at once. The car was headed to the southeast and it came so fast he could not tell what kind of a car it was. It was on the north side of the highway, moving southeast, like it was trying to get across the highway. When he saw the lights on the car he swerved the transport to the left and threw on the air brake on the trailer and the common brakes on the tractor. The

car struck along the cab of the truck, that is, the right side thereof, on the north side of the highway. He did not drive on the south side of the highway at any time, and the only time he drove out of the north lane was when he made his left turn in an attempt to avert the accident. The crash rendered him unconscious, the transport thereafter proceeded in a south and west direction, knocking down the Miller mail box, striking and twisting the south guardrail of the bridge, and falling into Pappio Creek. He saw no cars behind or in front of him in the vicinity of the accident prior to the time the accident occurred. He did not know whether Gutoski had backed out of the parking at the Wishbone Hut or pulled out forward, or what happened.

An employee of the defendant who was familiar with the trailer which was painted white, testified that after the accident there was a streak of blue paint about two feet long on the right panel of the trailer. Gutoski's Chevrolet was painted blue.

The evidence of the companion who was with Gutoski at the time the accident occurred, as offered by the defendant, was that they "went right off Dodge Street and I think it was the Wishbone"; that they did not get anything to eat at the Wishbone Hut; that Gutoski was backing out but she could not remember whether it was clear out on Dodge Street, was almost positive they were not across Dodge Street. They did not stop in the Wishbone Inn. She had a headache all day and wanted to go home. This testimony is from a statement taken by the deputy county attorney shortly after the accident and transcribed by a court reporter. At the trial she testified she did not remember, except she remembered they backed out of a place where there was a white fence.

The defendant contends that the foregoing evidence clearly proves the accident happened on the north side of the highway, because it shows that the deceased and his companion were at the Wishbone Hut immediately before the accident and were leaving the parking area in front thereof, at-

tempting to get onto Dodge Street to turn east, which was the direct route from the Wishbone Hut to the city of Omaha where they lived.

A deputy sheriff who arrived at the scene of the accident very shortly after it occurred, testified that he saw a body lying on the south part of the highway, six feet north of the shoulder of the highway and ten feet west of the point of impact, with the head to the east. He saw some debris 200 feet west of the Northwestern railroad tracks and 14 feet north of the south shoulder on the south side of the highway, and that there was a new tire rub near the debris. The debris consisted of breakage of car parts and glass, and pieces of car were on the highway about 50 feet southwest of the point of impact. The gasoline transport was in Pappio Creek. The tire marks led from the point of impact in a southwesterly direction onto the dirt road where it showed that the transport struck the Miller mail box which was lying on the ground. The guardrail on the south side of the pavement was bent and twisted, and the tire marks led from the broken guardrail down the bank. At the end of the tire marks was the truck. The Gutoski automobile was sitting in front of the Wishbone Hut facing north, off of the pavement, with the left side badly damaged.

Two other deputy sheriffs drove out to the place of the accident shortly after it happened, and testified they saw Gutoski's body lying on the south side of the highway. There were dirt and pieces of car in the second lane on the south side of the highway. One of the deputies made an official investigation of the accident and took measurements. He observed small pieces of broken parts and metal off of the fenders, and broken glass on the pavement 200 feet west of the Northwestern railroad tracks and 14 feet north of the south edge of the pavement. He also observed tire marks, or skid marks, on the pavement. He followed the skid marks off to the south of the highway in a southwesterly direction then onto the dirt, and then down in the Pappio Creek along the south edge of the highway. The

transport was in the bottom of the creek. There was other corroborative evidence as to the location of the body on the pavement.

The witness, Andrew Laux, testified that he and one of his employees went to the Wishbone Hut about 1:30 a. m., the morning the accident occurred, for something to eat. He was seated at a table facing south on the east side of the room, and in front of him on the other side of the table was a large window. He could see the parking lot in front of the Wishbone Hut. There were cars parked there, and he did not observe the headlights or reflection of any lights driven into that parking lot immediately preceding the crash. He knew Peter Gutoski during his lifetime and could recognize him. He further testified that if Gutoski had been at the Wishbone Hut he must have been there before the witness got there, at 1:30 a. m. The witness remained inside the Hut until hearing a terrific crash, he went outside. The balance of his testimony is corroborative of the police officers as to the position of the cars and the place where the body was lying on the pavement. This testimony is in direct conflict with the defendant's contention that Gutoski was at the Wishbone Hut and driving or backing out therefrom, as testified to by the defendant's driver.

The evidence is in conflict as to whether it was raining at the time the accident occurred. The windshield wipers on the transport were not in operation at the time of the accident.

Exhibits in evidence show the Gutoski car badly damaged in the front part, and no damage to the rear of the car.

The record further discloses the testimony of Paul Schwartz and Lester L. Cooke, who were riding to work in Schwartz's car. Schwartz testified, in substance, that he drove onto Dodge Street from Ninetieth Street at approximately 3:10 a. m., on the morning of April 15, 1944; that his windshield wiper was in operation on his car and that it was raining; he was proceeding east on the south side of Dodge Street. He was asked if he saw the accident and

said that he had seen sparks flying as the two came together; that the two vehicles came together on the south side of the highway; that after the vehicles came together the sparks kept flying and he saw the transport go over and hit the guardrail of the bridge and go down into the ditch; that it was headed west into the southwest. Cooke testified that he saw the accident and the cars come together; that as they rounded the bend at Seventy-eighth Street and just started to straighten out to drive straight east on Dodge Street, and as they approached the west end of the bridge over Pappio Creek, the two cars came together. He did not see anything but sparks flying, and pretty soon the transport went on down into Pappio Creek; that at the time of the collision the transport was headed off to the south; and that the accident happened in the south center lane of Dodge Street.

The testimony of Schwartz and Cooke is attacked by the defendant in that on cross-examination these witnesses repudiated their testimony given on direct examination, and corrected their testimony to conform to a statement made by each of them after the accident and their testimony taken at the inquest; that at the conclusion of their cross-examination it was apparent that they did not see nor witness the collision, nor see either vehicle before the collision, or at the time of the collision; that they first saw the transport when it was going down the bank into the creek after the accident occurred; and that they had not seen the Gutoski automobile until it came to rest after the collision in front of the Wishbone Hut.

Defendant contends that, under the circumstances as developed on cross-examination of these witnesses, their testimony became substantive evidence. In this connection defendant cites, among other cases, Perry v. F. Byrd, Inc., 280 Mich. 580, 274 N. W. 335: "Notwithstanding the fact that written statement is offered solely for impeachment purposes, so much thereof as a witness at time adopts by admission of the truth thereof becomes substantive evidence."

See, also, Breeden v. Martens, 21 S. Dak. 357, 112 N. W. 960.

Substantive evidence is evidence to prove the fact in the statement. See Perry v. F. Byrd Inc., *supra.*

"* * * if the witness reasserted the truth of the inconsistent statements, then they would be substantive proof, * * *." Ackerman v. Motor Sales & Service Co., 217 Minn. 309, 14 N. W. 2d 345.

"Defendant's statements upon adverse examination, amounting to admissions, constitute substantive evidence against him, and are not limited to their effect in impeaching him as a party or witness." Leslie v. Knudson, 205 Wis. 517, 238 N. W. 397.

We are not in accord with the defendant's contention that under the circumstances the testimony of the two witnesses, Schwartz and Cooke, is such that it forecloses the right of a jury in this case to determine the credibility of such witnesses. If there are discrepancies and inconsistencies in the statements made by the witnesses, as pointed out by the defendant, it is the jury's duty, providing the whole evidence is sufficient to take the case to the jury, to reconcile the discrepancies and inconsistencies if possible and, if not, to determine what part of such witnesses' testimony should be believed or what part of it should not be believed. The following rule applies: "The credibility of witnesses and the weight to be given their testimony are questions for the jury." Davis v. Bixby, 132 Neb. 25, 270 N. W. 834; Burry v. Interstate Transit Lines, 136 Neb. 695, 287 N. W. 66; Grantham v. Watson Brothers Transportation Co., 142 Neb. 362, 6 N. W. 2d 372. See, also, Hans v. State, *ante* p. 67, 22 N. W. 2d 385.

The defendant cites Gohlinghorst v. Ruess, 146 Neb. 470, 20 N. W. 2d 381, contending the implication exists therein that in a former trial the witness, a guest in the host's automobile, testified to certain facts that would absolve the host from any liability to such witness. In a subsequent proceeding brought by this witness wherein she was the party plaintiff against the host, she did not remember the

admissions she had made at the former trial, but changed her testimony to meet the exigencies of her own case.

In Gohlinghorst v. Ruess, *supra,* we cited Smith v. Boston Elevated Ry. Co., 184 F. 387, 106 C. C. A. 497, 37 L. R. A. N. S. 429, wherein it is said: "As the inconsistency is in the testimony of a party, a stricter rule is applicable than where the inconsistency is in the testimony of an ordinary witness. * * * A plaintiff, we think, after having sworn to facts resting in his own observation and knowledge before one jury, should not be permitted to swear to facts directly inconsistent and to obtain from a second jury a verdict in his favor which will involve the conclusion that his testimony at the first trial was knowingly false. A party testifying under oath is more than a mere witness."

This was the extent of our holding in Gohlinghorst v. Ruess, *supra,* and it is not in accord with the defendant's contention with respect to such case.

The defendant contends that there were no eyewitnesses to the accident, and there is no testimony as to how the accident happened, the testimony of witnesses Schwartz and Cooke having been wholly nullified by them on cross-examination as to seeing the accident, or the position of the cars before the accident; and that the plaintiff is required to rely wholly upon the circumstances and physical facts as revealed after the accident.

In this connection the defendant cites Anderson v. Interstate Transit Lines, 129 Neb. 612, 262 N. W. 445, and Ulrich v. Batchelder, 143 Neb. 697, 10 N. W. 2d 637, contending that the testimony of deputy sheriffs and others as to the location of the debris, skid marks, and the photographs in evidence, and positions of the vehicles, do not prove where the accident occurred or where the vehicles were at the time of the impact because the complexity of forces and resultants being unknown destroy the probative value of such evidence. In Anderson v. Interstate Transit Lines, *supra,* there was no evidence as to the weight, speed, location on the highway or direction of movement thereon of

either the truck or bus at the moment of impact. In Ulrich v. Batchelder, *supra*, there was no evidence of marks, broken glass, or other debris indicating the probable point of collision. Under the facts as appears in the two cited cases as compared to the facts in the instant case which have heretofore been set out, it is apparent that the cited cases are not in point, and the contention is without merit.

The general rule in this jurisdiction when a motion for a directed verdict is made, is as follows: "A motion for a directed verdict must for the purpose of decision thereon be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the evidence." Roberts v. Carlson, 142 Neb. 851, 8 N. W. 2d 175; McIntosh v. Union P. R. R. Co., 146 Neb. 844, 22 N. W. 2d 179; Halliday v. Raymond, *ante* p. 179, 22 N. W. 2d 614.

In the instant case the evidence is in conflict as to whether the collision occurred on the north side of the intersecting line of the Dodge Street highway running east and west, or on the south side thereof. The evidence is in conflict as to whether or not the Gutoski car was proceeding southeast on Dodge Street at the time of the collision, or whether or not it was driven from the parking area north of the pavement from the Wishbone Hut onto Dodge Street into the right side of the transport proceeding west, in an endeavor to cross to the south traffic lane on Dodge Street to proceed east thereon. The evidence with reference to the location of the debris, the tire marks, the position of the vehicles after the collision, the position of the body on the highway after the accident, and all other circumstances as testified to by the witnesses, are to be taken into consideration in applying the before-mentioned rule, as to its applicability to the instant case.

We conclude that under the facts and circumstances as presented by the record, the trial court should have submitted this case to the jury.

"In a law action it is error for the trial court to direct a verdict for either of the parties on an issue of fact on which the evidence is conflicting. Such issue should be submitted to the jury for their determination." Stoffel v. Metcalfe Construction Co., 145 Neb. 450, 17 N. W. 2d 3.

" 'Where evidence is in conflict and such that reasonable minds may draw different conclusions therefrom, the questions of negligence and comparative and contributory negligence are for the determination of the jury.' Parks v. Metz, 140 Neb. 235, 299 N. W. 643." Grantham v. Watson Brothers Transportation Co., *supra*.

For the reasons given in this opinion, the judgment of the trial court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.